**PATTERSON v. MOTTER, Collector of Internal Revenue.**

**No. 3575.**

District Court, D. Kansas, First Division.
Nov. 10, 1931.

Albert F. Hillix, of Kansas City, Mo., for plaintiff.

S. M. Brewster, U. S. Atty., of Topeka, Kan., for defendant.

POLLOCK, District Judge.

The facts are as follows: The plaintiff and his immediate family owned all the issued shares of the capital stock of the corporation known as the Fredonia Portland Cement Company of New Jersey, divided as follows: F. H. Patterson, 706; Mrs. F. H. Patterson, 705; Margaret P. Chandler, 704; Frances Patterson, 704; F. C. Doggett, 1. Being such owners of said shares of stock the plaintiff on the 23d day of June made and entered into a contract, in writing, with one Robert L. Cochrane of Chicago to sell all the capital shares of said corporation then issued and outstanding, the same being 2,820 shares, and no more, for the agreed price or sum of $1,200,000, settlement and payment to be made on July 1, 1925, at Kansas City, Mo. That this contract when completed and executed was a valid and binding obligation on the part of the plaintiff to sell and deliver the entire amount of the corporate shares of the cement company then issued and outstanding to the purchaser, Cochrane, on payment or tender of the purchase price, there can be no dispute. It is true, while the plaintiff, as seller of the 2,820, shares of the stock then issued by the company, did not own all the shares in his individual capacity, he bound himself to sell and deliver all, and for any breach of this contract he in his individual capacity alone was liable, and the contract did not purport in any manner to bind the corporation, and it was not bound thereby, and this for the reason the corporation did not own and could not sell the corporate shares issued and outstanding in the hands of its shareholders. When all this is considered, there can be no valid contention but that the sale made in pursuance of the terms of this contract was made by the plaintiff in his individual capacity and by no one other, for, viewed in no other light can the contract be held binding and enforceable, and contracts must, if possible, be so construed as to be valid, binding, and enforceable. See Hobbs v. McLean, 117 U. S. 567, 6 S. Ct. 870, 29 L. Ed. 940; United States v. Central Pacific R. Co., 118 U. S. 235, 6 S. Ct. 1038, 30 L. Ed. 173; United States v. Board et al. (D. C.) 14 F.(2d) 459; Richardson Gas & Oil Co. v. Altoona, 79 Kan. 466, 100 P. 50, 21 L. R. A. (N. S.) 214.

Now, while the contract does provide, if the purchaser of the capital shares deemed it more desirable to purchase the physical properties of the corporation than the entire issued and outstanding shares of its capital stock, that plaintiff, being so notified in writing mailed to him at his home in Fredonia, Kan., within three days from the date of this contract, June 23, 1925, would sell and deliver to the purchaser all the physical assets of the corporation on practically the same terms as those contained in the contract. This proposition, however, was dependent upon the option or desire of the purchaser, and on the plaintiff receiving written notice from the purchaser to so take over the property, which option was not exercised, or, so far as this record is concerned, never became valid under the terms of this contract.

As I comprehend the claim of the government in this case in levying the tax it did levy, it is based upon the fact that the sale of the assets of the Fredonia Portland Cement Company was made by the corporation itself. That in the making of that sale the corporation made a corporate profit on which the tax paid by plaintiff was chargeable to plaintiff under the provisions of section 280, Revenue Act 1926 (26 USCA § 1069 and note) on the theory as the corporation, making the profit by the sale of its entire assets, having parted with all of its property and assets, leaving nothing out of which payment of the tax levied could be made, that plaintiff profited by the sale made by the corporation, and the corporate profits received through the sale, plaintiff must pay the same as a stockholder in the corporation. The trouble with this contention of the collector is its major premise is unsound in fact. The corporation made no sale of its corporate assets to any one for any sum, and hence at no time had any corporate profit on which the income tax could be laid. There is no serious contention made by the collector but that the sale made was made under and in pursuance of the individual contract between plaintiff on the one hand and Cochrane on the other, and that this sale was of the issued and outstanding shares of the capital stock of the cement company and there can be no doubt but that the same was made in this manner because the plaintiff knew, as thus made, the income tax accruing from the sale falling on himself and the members of his individual family would be much lessened by that manner of sale. All this was discussed at the time the contract was entered into as a reason for its form and contents. Now it is true the contract in its performance was varied from the manner in which its performance was to be made, but from all the evidence in this case I find, through the serious illness, pain, and suffering of plaintiff, he was compelled to intrust to others the performance of his obligation to be performed under the contract, he being at

the time both physically and mentally incapable of so doing; that in such performance those to whom he confided the manner of his performance of the contract, through the ignorance or inattention to the details, did certain acts and caused certain acts to appear to have been the acts of the corporation, but that in truth and fact, when examined in the light of the evidence, they were not corporate acts at all.

It follows that I am compelled to find the major premise on which the government claims as the basis for the tax levied is not well founded in fact, but erroneous; the tax was illegally assessed and collected and plaintiff must have judgment for same.

It is so ordered.

II. In re Patterson Milling Company Stock.

[redacted] Coming now to the other claim made by plaintiff, it is this: The Fredonia Portland Cement Company of New Jersey made its income tax return in due form and manner for the tax year 1925, and in said return reported a net loss of $4,467.41. Hence, that no income tax was due from that company for that year. The Commissioner of Internal Revenue revised this return by adding to taxable income for the year an item of $767,596.73 as profit made by the cement corporation by sale of its corporate assets, the item heretofore considered, and further disallowing the corporation in its return a claim deductible from gross taxable income of a loss of $77,950, which claim of loss was disallowed, and this amount was added to the above item, making a total addition to the taxable income after deducting the loss of $4,467.41 of $834,298.82.

On this branch of the case the sole question is, Is the cement company entitled on the showing made to the deduction claimed of $77,950 from taxable income received during the year? This claim for deduction through loss arose in this manner. In 1924 plaintiff was the owner of 720½ shares of stock in a milling corporation known as the Rea-Patterson Milling Company. At the same time he was indebted to the cement company in the sum of $150,000. At just what time in 1924 this was, the record does not disclose. In any event, this indebtedness of $150,000 of plaintiff to the cement company was liquidated and canceled in consideration for the 720½ shares of the milling company's stock being transferred to the cement company. Some time in the taxable year of 1925 the cement company, as owner of the milling company stock, sold it to a son-in-law of plaintiff by the name of Chandler for $72,050, thus effecting a loss to the cement company of $77,950 if this purchase and sale was made in good faith.

It is stated on the briefs this claim of loss sustained by the cement company was denied by the Commissioner on the ground of fraud. I do not find any such claim of fraud made by way of defense to this action. Neither do I find any ground for any such claim of fraud in the evidence found in this record. The contention now made in argument by those representing the collector is this: That the record contains no evidence tending to show the value of the shares of stock in the milling company at the time the shares were sold by the cement company to Chandler. With this contention of the collector in reference to the 720½ shares of the capital stock of the Rea-Patterson Milling Company in the brief of counsel for the collector, it is said: "In order to demonstrate that a loss had been sustained it was necessary to show that the selling price of the stock was less than the cost of the stock in the amount of the claimed loss. It will be demonstrated hereinafter that plaintiff has wholly failed to sustain the burden of proof."

With this contention of the collector I cannot agree, for as shown by transcript of the record of the evidence taken on the trial of this case is found the following evidence of plaintiff:

"Q. Did the corporation agree to accept this stock in payment of your indebtedness of one hundred and fifty thousand dollars? A. Yes.

"Q. You were familiar with the mill's business over these twenty or so years? A. Well, just more or less.

"Q. Did you consider that one hundred and fifty thousand dollars would be a fair value for this stock at that time? A. Yes, at the time; in 1913 we looked up the statement and it was worth two hundred and some odd dollars a share. * * *

"Q. And you considered it a fair value in 1924, the date of its sale by you to the corporation? A. Yes.

"Q. Did the corporation sell this stock? A. Yes, later on it did.

"Q. When did they sell it? A. Their records will show, 1925 I reckon.

"Q. And what did they receive for the stock? A. One hundred dollars a share?

"Q. That was a bona fide sale made in good faith? A. Yes, Mr. Rea who had been manager of the mill—I say, Mr. Rea the man-

ager of the mill—who had been manager for a long time, in fact since its origin, died.

"Q. Why did you want to sell the stock, or why did you sell the stock? A. Well, we had no manager.

"Q. Any other reason? A. Well, at that time I discovered the rascality of some of the directors. * * *

"The Court: You say you sold it in 1925 to the cement company for one hundred dollars a share? A. In 1925 for one hundred dollars a share.

"The Court: Was that a reasonable price for it? A. That was the best offer I was able to get; the only offer I was able to get was from H. W. Reed and he seemed to be the only man that would take it at any price, and I was willing to take him up. Chandler came down from St. Louis on this other business and he got familiar with what I was doing and he asked me to let him have it at same price."

Again, at page 70 of the transcript of the evidence of E. E. Wettack, this is found:

"Q. And you were familiar with the affairs of the Rea-Patterson Milling Company? A. Very familiar.

"Q. In what connection, explain to the court how your knowledge of the affairs of the mill came about? A. We loaned them money continuously and they made us financial statements.

"Q. Did you loan individual stockholders money upon stock in this company as collateral? A. We loaned Mr. E. S. Rea twelve thousand dollars on one hundred and fourteen and one-half shares of mill stock, common stock. "Q. Do you know whether there were any sales of this Rea-Patterson Milling Company common stock during the year 1925? A. 1925 was the year in which the estate of Ed Rea sold the mill four hundred and thirty shares. "Q. Mr. Wettack were you the administrator of the estate of Mr. Rea? A. I was.

"Q. Do you recall any circumstances in connection with that sale that would indicate whether that was or was not a fair market price for that stock at that time? A. I think it was.

"Q. You stated that the bank loaned twelve thousand dollars on these one hundred and fourteen shares of stock; was that loan paid? A. It was paid by the sale of the stock.

"Q. And did the stock sell for more or less than the amount of the loan? A. The stock sold for one hundred dollars a share at public sale."

In short, from a consideration of the evidence, I find in the record abundant proof of the market value of this milling company stock when purchased by the cement company and at the time the cement company sold the stock to Mr. Chandler. I therefore find a loss was made on the Rea-Patterson Milling Company shares of stock purchased by the cement company from plaintiff for $150,000 and sold in the taxable year 1925 by that company to Mr. Chandler for $72,050, and that the loss of $77,950 should have been allowed the cement company.

As I am not able to find the sale of the assets of the Fredonia Portland Cement Company was made by that company, but, on the contrary, was made by plaintiff in pursuance of his individual contract with Mr. Cochrane, although, not through any fault of the plaintiff, was not consummated in all things in accordance with the terms of the contract; that the cement company made no taxable profit by said sale of its assets for the reason that the corporation made no sale whatever as by the collector claimed as the basis of his defense in this case; and, further, the claim for loss on the Rea-Patterson Milling Company stock should have been allowed to the cement company. I therefore find no occasion for making findings of fact in this case and so decline to do.

There will be judgment for the plaintiff for the amount of the taxes illegally collected from him as a shareholder in the Fredonia Portland Cement Company, as claimed by plaintiff in his petition, and interest thereon.

It is so ordered.